All right, our next case is 22-5002, Lucas v. Turn Key Health, and Mr. Murphy, you may proceed. Thank you, Your Honor. Good morning. May it please the Court. My name is Lawrence Murphy. I represent Yolanda Lucas as the special administrator of the estate of Michelle Ann Caddell. Michelle Caddell was arrested and booked into the Tulsa County Jail on December 27, 2018. Approximately 10 months later, on October 30, 2019, Michelle Caddell was diagnosed at Hillcrest Hospital in Tulsa with squamous cervical carcinoma that was at least stage 3 and extensive necrosis. Excuse me, let me just, I'm curious, what was she held in jail for, for 10 or 11 months without going to trial or anything else? The charge was, it was a robbery charge. And I believe, this is nowhere in the record, Judge Kelly, that seems to me to be part and parcel of the fact that Tulsa County Courthouse was moving very slowly. Very slowly is right. Very slowly. Well, this is pre-COVID. We're talking 2019, aren't we? 2018 all the way to October 2019, which would be the beginning, if I'm... Pre-COVID. Okay, pre-COVID. Then I don't know why she was in for 10 months with, but she was there. The physicians at Hillcrest on October 30, 2019, determined that she would need radiation and or chemotherapy. Just, that was a Wednesday, October 30th. The following Tuesday, November 5th, Michelle Caddell was swiftly released from the Tulsa County Jail. Bond is gone and she's on her own. Michelle Caddell died August 16th, 2020, at the age of 36 years. We have brought claims against a doctor who was responsible for the care at the jail, an administrator for Turnkey, which was the healthcare provider at the jail, Turnkey, as well as the sheriff in his official capacity. The underlying court, the district court, granted a motion to dismiss with one of the key factors that the underlying, that the district court relied on was the litany of care. What? I'm sorry. The litany of care. Lit... Okay. The litany of care that Ms. Caddell received in Tulsa County Jail. We believe that the precedence from this court and the law on the Tenth Circuit is very clear. Relying on Hunt. We cannot agree with the district court that the facts as alleged by Mr. Mapp, which we of the proceeding accept as true, reflect a mere disagreement with his medical treatment, not giving rise to a constitutional claim, nor does the fact that he has seen numerous doctors necessarily mean that he received treatment for serious medical needs, i.e. that treatment was prescribed at all or that prescribed treatment was provided. Now, the briefing is extensive. The complaint filed in this case was extremely detailed. There is a litany. From early on in her incarceration, January 30, 2019, Ms. Caddell tested positive for chlamydia. That's a red flag. It's a first red flag. She made her first documented complaint of vaginal discharge to the jail staff on June 22, 2019. Then on July 5, July 6, July 7, she's complaining. She's complaining of pain. So as early as that point in time, we have an inmate who is in pain. We have an inmate complaining of vaginal discharge. This goes on and on. When she was finally evaluated, nothing happened. Much like that quote I just read. Tests were ordered.  A CBC was ordered. But nothing followed those results other than a notation or notations in the file that generally say, this is a healthy woman. Nothing to see here. This continues on and on. And by November 15th of 2019, defendant Myers and the jail staff knew that she had been diagnosed with chlamydia. She was complaining of ongoing hip and groin pain for weeks. That she had been complaining of ongoing abnormal vaginal discharge for weeks. She had also been complaining of ongoing irregular vaginal bleeding for weeks. That she had bad blood. That she had blood results which indicated sickness. She had a heavy growth of E. coli. And importantly, her symptoms were becoming more severe, not less severe. Nothing was done. Eventually. If I can stop you there for a sec. I mean, at least early in the timeline, the medical professional, the doctor did order various tests and the like. I mean, you know, she was coming to the clinic. They're looking at her. They're taking blood. They're analyzing that. So, at least early on, it looks like we're kind of in the land of negligence, misdiagnosis. You don't have to agree with that characterization. But if you do, at what point did this timeline turn into a situation where the doctor, you know, subjectively knew that she had a severe medical condition and then, you know, ignored it? I mean, it's a little unfair. When can I say, okay, October 14th? August 20th? Candidly, Your Honor, I'm going to tell you that that has been debated greatly over the last two weeks in my preparations for this argument. And I can't intellectually. I'm glad I got a moot court question right. It would be intellectually dishonest for me to say that at the beginning, it went off the rails, as you had mentioned in the last presentation. It starts slow and it builds gradually. If you're asking for a specific date, that's very difficult. And respectfully, I don't think the authorities in the circuit require us to identify this is the date, the exact date that the constitutional violation occurred, the underlying constitutional violation. Speaking candidly, I believe that between August 15th, that litany that I just provided with you, and then up until... Well, on August 14th, she had an elevated white blood cell count, didn't she? Yes, she did, Your Honor. And isn't that indicative of something? It is indicative of sickness. It's indicative that someone is not well. And on August 15th, didn't she have heavy E. coli growth? Yes, Your Honor. That is correct. Is that indicative of anything? It is indicative of a problem. It's indicative of sickness or disease. They gave her Tylenol. They gave her Tylenol at that point in time. Later on in the timeline, they refused to even give her Tylenol or ibuprofen. Going back to finish your question, Your Honor, by September 30th, at the absolute latest, I would argue earlier than that. But by December 30th, on September 15th, she spoke with a nurse who recognized that Ms. Cadell had been experiencing menstrual cycle with blood clots and pain starting 10 months ago. Recognizing how severe the symptoms were, the nurse placed a referral for Ms. Cadell to see an obstetrician. Five days later, the healthcare administrator, Shirley Hadden, unilaterally canceled that referral, advising that Ms. Cadell had seen the medical director multiple times without complaints of months of heavy bleeding. That's incorrect. Despite all of these worsening symptoms, Defendant Myers agreed that the referral to the OBGYN was not needed. By that point in time, we're off the rails. That would be my direct answer to your question. Now, using the legal standard that's applicable here, the doctor subjectively knew and ignored the risk in mid-August. That's what I think I hear you saying. For the administrator, it's a little unclear from your complaint who this person is and why she would be involved in any aspect of the medical care for inmates. Does she have some responsibility for the medical unit, or is it known from the complaint? From the complaint, I think it's at least that it can be inferred, reasonably inferred, from the complaint that Shirley Hadden is the services administrator, as the turnkey employee responsible for the administration of that contract, of that agreement to provide health services for the inmates. She certainly, reasonable inference from the complaint, had the authority to prevent an inmate from being seen or referred to an OB. And that goes straight back to a simple gatekeeper analysis under the precedent of this court, under the authorities. She stopped that from happening. How do we tease out her subjective bad intent from the allegations? Unless she knew about the medical history here, and there's some suggestion that she said there was no medical history of excessive bleeding complaints, which may not have been true. How do we go where you want to go and find that she was subjectively aware of the risk of imminent harm? You could, excuse me, based on the relationship between the jail and turnkey, her employer, how the money flows back and forth for the provision of health care services. It is a simple business proposition. The less referrals, the less... I know, but I get that. But is your argument that she, that the administrator, made an unconstitutional decision on these facts, or that the administrator ran the jail in an unconstitutional fashion, as applied to frankly any inmate, not just the clients? For the specifics of this case, the answer would be the first, that she made a specific unconstitutional decision with regard to Michelle Caddell overruling a trained medical professional for the benefit of her employer. I only have a minute and 30 left. I'd like to reserve that time for rebuttal if acceptable. You may. Thank you, Your Honor. Let's hear from turnkey. May it please the court, I'm JoLynn Jeter and I represent the appellees. I'll pick up right where we left off with regard to Shirley Haddon. On September 20th, she did not refuse... I'm sorry, what was the date? September 20th, 2019. She did not refuse the referral. She asked that the complaint be verified. She was justified in that request, seeing how when it came through to her to make the referral, it said that the patient had been complaining of months of bleeding, 10 months of bleeding. When she looks at the record, she can see that the first complaint of excessive bleeding was on August 5th. But the first indication was on January 23rd, 2019, when she tested for chlamydia. And then the next thing that happened was elevated white blood cells not very long after that. And the next thing that happened was the E. coli growth not very long after that. And it finally comes down to the date you're talking about. Correct. But with regard to Ms. Haddon, she receives a referral that says the patient had been complaining of months of heavy bleeding. She can see in the record it's only been one and a half months of complaints of heavy bleeding. And so she simply asked that it be verified. Within just a few days, the tests are done and it's verified. And then within a few days, she is seen by the OBGYN. How many days exactly? September 20th is when she asked that it be verified, Ms. Haddon. On September 23rd, the tests are ran and results are obtained. And then by September 27th, she sees the OBGYN, Dr. Hameed. So seven days. Yes. And with regard to Ms. Haddon, I think we certainly have to apply this court's case law. There is a subjective component that's necessary when looking specifically at Ms. Haddon. And I would submit that she was not subjectively aware that Ms. Cadell at that time was suffering from cervical cancer or a serious medical need. She gets a referral. It does not match up with the records. She simply asks it to be verified. As soon as it's verified and she sees the test showing it's verified, she submits her... Well, the complaint doesn't say she submits her. The appointment could have been there the entire time, but the referral goes through. Now, Ms. Haddon is not even a party here. Correct. She was named as a party, but she was not served. Right, never served. She is not a party. Has she been dismissed? So are we talking about the doctor or are we talking about Ms. Haddon? Right now, we've been talking about Ms. Haddon, but I'd like to talk about the doctor as well. Ms. Haddon has not been formally dismissed. She was never served. And the case has proceeded all this time without her as a party. But she's still named in the complaint. She hasn't been dismissed. As far as I know, that's correct. Okay. Do we have a final judgment? We do. Even though she's still around as far as the complaint is concerned? Yes. What's your authority on that? Judge Madison, can you speak up a little bit? I'm sorry. Well, I believe when the district court entered, it's... Scott, could you restate your question? Yeah. My question is, if Ms. Haddon has not been dismissed and she's still part of the case, do we have a final judgment? That's a good question. The district court entered a final judgment. Well, it entered a judgment, but is it final when there's still a party named in the complaint who hasn't been dismissed? I think because of the time having expired for her to be served or for the plan to request that she be served, that she never became a party in the case at all. Well, she was removed from the caption by the district judge, wasn't she? Yes. She never effectively became a party, even though they put her name on the complaint, but she was never entered into the case. I also want to just point out that we do not view this case as a failure to treat case. And I think the arguments on appeal have really strayed from the complaint. And the complaint is pled as a failure to refer or a delay in care type complaint. The crux of the complaint, if you look at first cause of action, inadequate medical care, it says... Well, I thought that the issue here, and maybe I've missed it, that the doctor was deliberately indifferent to the serious medical needs of this individual. That's certainly an issue, but I just want to be clear about what the claim is. And again, this is not a failure to treat. There aren't allegations in the complaint saying Dr. Haddon or anyone within the medical unit failed to treat her symptoms. When she's having symptoms of vaginal discharge, bleeding, pain, those symptoms are being treated. The medical record is this thick. You think Tylenol is a good treatment for that kind of stuff? Well, the allegations... There were a tremendous amount of pain medications being prescribed, antibiotics. These symptoms that are being presented, vaginal discharge, bleeding and pain, groin pain, those are all symptoms of chlamydia. The doctor is treating her for what she's been diagnosed with. He's treating those symptoms. The allegations of treatment are not in the complaint. What about referral to a gynecologist? I'm sorry? Did they refer her to a gynecologist? She was referred September... When? Well, she saw the gynecologist on September 27th. When? I'm sorry. September 27th. But my point again, Dr. Myers, he is treating the symptoms as they arise. And he is performing all kinds of tests, all kinds of treatment, ultrasounds, pelvic exams, all kinds of things to treat the symptoms that are being presented. But he's not a gynecologist, is he? He is not. But these symptoms are consistent with very common, less severe conditions. Tissue discharge is the day she's transferred to the hospital, Your Honor. On October 30th. When her symptoms reach that point. When they reach the point of requiring referral, she's referred. When they reach the point of requiring transfer to emergent care, she's transferred. And again, I believe that the allegations of failure to treat, or the allegations of all the treatment that was provided were omitted from the complaint because the complaint is attempting to assert a delay claim. Not that the symptoms weren't being treated, but rather the doctor should have recognized based on these symptoms, oh, she has cancer, and therefore she should have been referred to the gynecologist or the hospital. A gatekeeper. It could be a gatekeeper claim or a delay in care claim. Those can overlap. But if you look at the complaint, that's the claim that's being presented. So when we talk about... What's the difference between a delay in treatment and failure to treat? At some point, aren't they the same thing? Well, here, the patient was absolutely being treated. Well, no, I understand. I'm just asking you more of a conceptual question because you're saying that it's not a treatment, it's not a failure to treat claim, but it may be a delay in treatment. Well, I think it's essentially the same analysis. However, I'm pointing it out because the court shouldn't look at whether or not these symptoms were being treated because the plaintiff or the appellant has failed to allege. For example, there's a statement that says she was suffering 10 out of 10 pain. And after that, the complaint's silent. There is not an allegation saying that pain was not treated. In fact, there's not an allegation anywhere in the complaint saying her pain was not treated because it was. I think that's omitted because they say, well, we're not going to get into the symptoms and whether those were treated. We're complaining about him not recognizing she had cancer and sending her out earlier. And just based on this pain argument because it came up earlier, she was never refused pain medications. The complaint alleges that she is on both Tylenol and ibuprofen. Well, that's not a very good, I mean, that's drugstore stuff. And then they turn her down on ibuprofen later on. Well, she was on ibuprofen. What the complaint alleges is that the doctor refused to increase the ibuprofen, which could have been based on absolute medical legitimate reasons. There's a continuum of things. And if you're treating somebody for a broken arm by giving them a brace on their foot, that's, if they're being treated, but it's not going to help them. Again, I want to make it clear that she was being given narcotics. She was prescribed codeine. But it is not pled in the complaint. And that's because if you look at the complaint, the claim made in the complaint is failure to refer, failure to get her to the hospital. It's not failure to treat. And I want to make that very clear. So where is your reference to codeine coming from? That's my knowledge of the medical record. But for our purposes, we have the complaint. And for your purposes. So why are you telling us about things outside the complaint that aren't even in the record? Because for your purposes. No, for our purposes, we can't consider that because we have to look at the complaint. I agree. I agree. But you keep telling us about things that we shouldn't even be considering. Your Honor, I completely agree. But when you look at the complaint, the claim that's made, go to first cause of action, inadequate medical care. The claim that's made is failure to refer an emergent condition. And there are also, when you look at the complaint itself, only within the four corners of the complaint, there's never an allegation that the symptoms were not treated. There is never an allegation that the pain was not responded to. I understand your argument. But I think we understand each other. With regard to Dr. Myers, Your Honor, here, as you know, there is a subjective component to this claim. By the way, when was the last time Dr. Myers saw the plaintiff? I believe it was August 27th. According to the complaint. Okay. And the referral eventually happened on September 27th. Correct. Again, the subjective component here, since the Supreme Court's decision in Farmer, the law has mandated, in order to isolate those who inflict punishment as it's used in the Eighth Amendment, that a Section 1983 deliberate indifference claim require a mens rea akin to criminal recklessness. An official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. The Farmer Court says inquiry into the official state of mind is required. And here, Dr. Myers, he was not aware that she had cervical cancer or that she was suffering from a severe, serious medical harm. Her symptoms were consistent with more common, less severe conditions for which he viewed she had and he treated. I think he should have been more aware of what was going on. And that may get into the obviousness analysis. And the cases from this court with regard to obviousness are conditions that would be obvious to a layperson. These symptoms here would not be obvious. He's not a layperson. He's not, but that's not the standard. The court standard is not a reasonable doctor standard. It's a reasonable person, layperson standard. Do you have a case for the obviousness point? The self case, I think, is a very good case for this. An oxidine. Would it be obvious to a layperson that these symptoms, vaginal discharge, bleeding, groin pain, is that obvious to a layperson that you have cervical cancer? No, that's not the question. It's whether there ought to be a referral for further treatment. It's not they knew yet she had cancer or anything else. Does she need to be in a hospital? But those symptoms can be treated by a physician, such as Dr. Myers. For UTIs, sexually transmitted diseases, vaginal infections, that's what he can treat and that's what he did treat. The case of, also, as far as obviousness, oxidine is a good case because it talks about the finger that's being reattached. It's very obvious that it's coming off. It's black, it's rotting, it's necrotic. And you can see for days and days and days that the finger's rotting and coming off. Any person can see that. That does not require medical judgment. Here, he exercised his medical judgment in reviewing these symptoms, treating the symptoms, analyzing her condition in good faith, investigating her condition. An exercise of medical judgment, we cannot use hindsight to second guess that medical judgment. This is not a medical board of review and he exercised his judgment in analyzing common, less severe symptoms. Can you just address the Monell claim for 30 seconds? Yes. With regard to the Monell claim, obviously there has to be a policy, customer practice identified. I don't believe that's been done in a specific, non-conclusory way. Even if it had been, there's certainly no allegation that would satisfy the subjective component, the deliberate indifference component that the county court attorney knew. Do we look at the administrator for that subjective component or is there somebody else? Well, you would look at the individual actors and then you could also, under Croson, look at multiple actors. But there are no allegations supporting any of it. I would like to end with a quote from Self. Where a doctor faces symptoms that could suggest either indigestion or stomach cancer, I'm at time. May I finish? Please. And the doctor mistakenly treats indigestion, the doctor's culpable state of mind is not established. Even if the doctor's medical judgment may have been objectively unreasonable. Thank you, counsel. Urge the court to affirm. Thank you. Appreciate it. We have some rebuttal time. Thank you. The quote from Self, just as a reminder, is from a case that was resolved at the summary judgment stage, not at the motion to dismiss stage. Could you clear up whether your claim is a failure to refer or failure to treat? Could you address that, please? I think that the allegations are specific. I think the allegations and the reasonable inferences from there state a plausible case for failure to treat, failure to refer, and specifically with regard to Haddon, an underlying constitutional violation with regard to her gatekeeper role. And so our claim is all of the above. She mentioned Oxidine. This case is very much like that, except worse. The issue, most of our authorities, and why I think it's so important for this court to intervene and reverse the district court, most of our authorities in this district on this issue relate to external injuries, a finger severed by a cell. That's obvious to everybody in this room. I'm past time. Go ahead. Internal injuries, internal disease, that is something that he didn't have to know it was cervical cancer. He just had to know this woman was really sick and getting sicker and nothing was working and make a referral. Yeah, thank you. Is Haddon out of the case? Help us there. Yes. Thank you. Thank you, Your Honor. Thank you for your time today.